# Cases

# THIRD DEPARTMENT,

AT

## GENERAL TERM,

### September, 1882.

---

GEORGE H. WILLETT, Plaintiff in Error, *v.* THE PEOPLE OF THE STATE OF NEW YORK, Defendants in Error.

*Evidence — statements of a prisoner made after his arrest — when they are admissible as having been voluntarily made — letters found in the prisoner's possession — when they cannot be received in evidence against him — failure of the accused to deny statements made by a witness before the coroner's jury — when the fact of his silence will not authorize an inference of his acquiescence in them.*

One Willett was arrested upon a charge of murder and taken to the district attorney's office, where he had a conversation with Hotchkiss, a detective. Willett made a statement voluntarily and with knowledge that Hotchkiss was a detective. Thereafter at a second and third interview the prisoner made similar and further statements, those of the third interview being reduced to writing and signed by him. On the second and third occasions he was told by the district attorney that he need not make the statements unless he was willing to do so; that if he was innocent he did not see that it would do him any harm; that if he was guilty it would probably be used against him and that it might hang him.

*Held*, that the statements were voluntarily made and were properly admitted in evidence upon his trial.

That where there is no conflict in the evidence as to the circumstances under which such statements were made, the admissibility of such statements should be decided by the court and not be left to the jury.

*Semble*, that the rule is the same even when the evidence is conflicting.

Upon Willett's arrest letters were found in his trunk from the deceased and also

from the sister and the daughter of the deceased, which tended to show that the writers of them knew that improper relations had existed between Willett and the daughter. No letters from Willett in answer to, or calling forth the said letters were produced or proved to have been written.

*Held,* that the court erred in allowing the letters to be received in evidence against the prisoner.

*It seems,* that the letters might have been received for the sole purpose of showing that Willett had notice of the statements therein contained, as bearing upon the question of motive, but that they could not be admitted as evidence of the truth of the facts stated. (Per LEARNED, P. J.)

A witness, upon being examined before the coroner's jury, testified that, on the night of and shortly after the murder, a stranger called at her house and asked the way to Sandy Hill, and also for a glass of water. In order to test the memory and correctness of the witness, the prisoner and a number of strangers were placed around a room, and the witness upon being asked to pick out the individual she saw at her house that night, designated the prisoner. She was then seated, and a number of persons passed behind her in such manner that she could not see them, each one repeating the question as to the road to Sandy Hill and asking for a drink of water. The witness again recognized the prisoner by his voice. In neither instance did he deny that he was the person she saw that night. Upon the trial these experiments were admitted in evidence upon the theory that from the prisoner's silence at that time the jury might infer the truth of the witness' statement that he called at her house that night.

*Held,* that the prisoner was under no obligation to deny the truth of the statement made by the witness before the coroner's jury, and that the court erred in admitting the evidence.

WRIT OF ERROR to the Court of Oyer and Terminer, in Warren county, to review the trial and conviction of the plaintiff in error of murder in the first degree, and also an appeal from the judgment, entered upon the said conviction.

*Hughes & Northrup,* for the plaintiff in error.

*H. A. Howard,* district-attorney, and *John L. Hill,* for the defendant in error.

BOARDMAN, J.:

The prisoner was convicted of murder in the first degree on the 10th day of October, 1881. The Code of Criminal Procedure took effect September 1, 1881. (Sec. 963.) But as this indictment was found and proceedings were had therein prior to that date, all further

proceedings must be conducted as if the Code had not been passed. (Sec. 962 of the Code of Crim. Proc.) Hence this review must be made by virtue of, and under, the writ of error allowed by the learned justice who presided at the trial, although for safety an appeal was taken on behalf of the prisoner under the Code of Criminal Procedure. The trial occupied the attention of the court for about three weeks. The return to the writ of error contains nearly 3,000 folios, notwithstanding, as we are advised, much of the evidence has been omitted. It would be strange if, in the course of so long and exhausting labors, the trial court should not have committed some one or more errors, and learned counsel are always ready with innumerable objections and exceptions to secure a vantage ground for future use in case of disaster. Under the Code of Criminal Procedure (§§ 542, 684), technical errors or defects, or exceptions, not affecting the substantial rights of the parties, will be disregarded if the language of the legislature shall be followed by the courts. By such a rule the great mass of these exceptions would go for nothing, as purely technical and in no rational way affecting the verdict or the rights of the prisoner. But judges may, in the future, disregard the power evidently intended to be given by the legislature for the more sure and effectual administration of criminal law and hold, as now, that no exception, in a capital case, is too trivial to receive the wise and careful consideration of the court of review, if *by possibility* it *might* have had an influence upon the minds of the jurors or affected their verdict : "A tender regard for life and liberty " may constrain courts to protect prisoners from the verdicts of juries, where, *by possibility*, such verdicts *may* have been influenced by errors in the admission or rejection of evidence. In such case the guilt or innocence of the accused, the actual or probable effect of the erroneous rulings, the exceeding difficulty of attaining such absolute degree of accuracy as shall satisfy the intellect of all appellate courts and judges, all these considerations will be disregarded and the administration of criminal law will continue to be reproached with its weaknesses, its delays, its inefficiencies and its evasions of justice. The rights of the people, their lives and the safety of their persons and property, are entitled to be looked after with as much tenderness and respect as the lives and liberties of criminals, under the verdict of juries. Every judge, who has had experience in the

trial of causes, knows how many and how difficult are the questions constantly arising which he must decide with a moment's reflection only. He who tries a cause, better than any other, knows that the administration of justice is not always attained by absolutely accurate means. Public opinion recognizes as the truth, that learned and devoted counsel, abundant means, or warm and efficient friends, will enable a criminal to escape his just judgment, while his poor and friendless brother in crime is promptly tried, convicted and punished.

Upon the evidence produced upon this trial the guilt of the prisoner must be assumed. The person who shot John B. Pair was guilty of the crime of murder. That is conceded. The evidence embraced in the return tends very strongly to show that the prisoner was in the immediate vicinity at the time of the murder; that he had the instrument by which it might have been done; that he had an adequate motive; that the relations between him and the dead man were unfriendly, and that his appearance, conduct and declarations after the murder furnished evidence of his guilt. If, then, no errors were committed, if the prisoner's counsel has taken no valid exceptions to the rulings and decisions of the court during the trial, the conviction must stand.

Not long after the murder the prisoner was arrested and carried before the district attorney and into his office. A conversation was there had between the prisoner and detective Hotchkiss, in which the former gave the details concerning his coming from Chicago to Fort Edward and Glens Falls. That statement was voluntary and under no influence calculated to induce false statements. The prisoner was told by Hotchkiss that he was a detective and would like to have a talk with him if he had no objection. He said, all right, he had none. He knew who Hotchkiss was and what he wanted, namely, to get out the facts as far as he could. No inducement or promise or encouragement was held out to him. He was not urged to tell, but did it as willingly and freely as was possible. It seems clearly covered by *People* v. *Wentz* (37 N. Y., 303); *Kelley* v. *The People* (55 id., 571); *Murphy* v. *The People* (63 id., 596, 597).

At a second and third interview the prisoner made similar and further statements, those of the third interview being reduced to writing and signed by him. On these occasions the district attor-

ney was present and used on the second occasion this language :. "That he need not make that statement if he was not willing; that if he was a guilty man it might hang him as it would probably be used against him." The prisoner replied he had no objection to making the statement and thereupon made it. On the third occasion, when the statement was reduced to writing and signed, the district attorney said "that he need not make this statement if he did not choose to, was not perfectly willing, and that if he was guilty he better not make it, because it would be used in evidence against him, and perhaps he better not make it, or words to that effect, and if he was an innocent man he could not see that it would do him any harm, but if he was guilty it might and would be probably used in court againt him." The prisoner expressed his willingness and desire to make this statement. The statement was thereupon made, reduced to writing, and after being read over to him signed. In the body of the statement, at the end of it, is this language : "I have made this statement voluntarily and of my own free will, and after having been written down it has been carefully read over to me and I find it to be true in every particular."

These statements were objected to as incompetent and inadmissible under the circumstances, because involuntary and under the duress of arrest, etc. The objection was overruled and an exception was taken. If the statements so made were incompetent and they were wrongly received as evidence, the conviction must be reversed, because the evidence so submitted for the consideration of the jury was very important and must have had an important bearing on the verdict.

The important question to be decided was, whether the prisoner voluntarily and of his own free will made the statement? If he was advised or induced, or frightened into the act, the evidence was not competent.

It must, however, be observed that the declarations proved were not confessions of guilt but assertions of innocence, from which, in connection with other evidence, inferences of guilt may be authorized. The declarations may, therefore, more readily be believed to have been voluntary.

It would be a useless labor to examine the many cases touching the admission or rejection of this kind of evidence. It would be

difficult in many cases to reconcile them. Wharton, in his work on Criminal Law (§ 685), says the settled law may now be held to be, that "confessions made, even to constables or police officers, cannot be excluded, unless it appear that there was a threat of harm or a promise of worldly advantage employed by an authoritative person." So in many cases that might be cited, such evidence has been rejected when drawn out by expressions like these: You had better tell the whole truth; if you are guilty it will be better for you to say so; if you make any disclosures I will do what I can for you (*Com.* v. *Taylor,* 5 Cush., 605); it will be the worse for you if you do not confess; I can do nothing for you unless you tell all you know (*Rex* v. *Partridge,* 7 Car. & Payne, 551). The counsel for the prisoner relies much upon *Regina* v. *Drew* (8 Car. & Payne, 140; 34 E. C. L. R., 654). But that case was overruled by the Court of Criminal Appeal (*Reg.*v. *Baldry,* 2 Den. C. C., 430; S. C., 5 Cox C. C., 523), after a very full and careful discussion of prior decisions. The decision in Baldry's case (12 Eng. L. and Eq., 591), made in 1852, has continued as authority to the present time. There the officer said to the prisoner, "he need not say anything to criminate himself; what he did say would be taken down and used against him." (EARLE, J.) Unless there was a threat or a promise to induce it, the confession ought not to be excluded. He adds: "In many cases where confessions have been excluded, justice and common sense have been sacrificed, not at the shrine of mercy, but at the shrine of *guilt.*" All the judges held that the language used was not a threat and did not promise any advantage or harm. The language is very like that used in the present case, and it is not apparent how a threat or inducement can be inferred in the one case and not in the other. The authorities are very fully reviewed in 1 Wharton's Criminal Law (§ 685, etc.), and leave little doubt that the admission of the prisoner's statement was correct.

There was no conflict of evidence concerning the language used by Hotchkiss and Howard before the statements of the prisoner were made; therefore it was the duty of the court to decide upon the admissibility of the evidence and not to leave that question to the jury. Such, doubtless, is the rule even where the evidence is conflicting. (Whar. Cr. Law, § 698.) Lord CAMPBELL, C. J., in *Reg.* v. *Baldry* (*supra*), of this rule of law, says: "If the matter

were *res integra*, I should, perhaps, have doubted whether it might not have been advisable to allow the confession to be given in evidence and let the jury give what weight to it they pleased." However the rule may be the evidence was admitted, as we hold, properly for the consideration of the jury. If the court afterwards allowed the jury to reject such evidence, if they believed it was obtained by improper inducements, the court erred in the interest of the prisoner and against the people. Such an error is not available to the accused. The various statements of the prisoner were obtained from him freely and voluntarily, and they were competent evidence.

On the night of the murder a stranger came to the house of Mrs. Wing, about four and a-half miles from Glens Falls, at about eleven o'clock at night, and asked the way to Sandy Hill and also for a glass of water. Mrs. Wing was called before the coroner's jury and identified the prisoner as the person she saw that night as she believed. During the pendency of the proceedings before the coroner and in his presence, and in the presence of the jury, certain experiments were tried to test the memory and correctness of Mrs. Wing in such identification. The prisoner and a number of other strangers were placed around a room and Mrs. Wing was brought in and asked to pick out the individual she saw at her house that night and she designated the prisoner. Again she was seated so as not to see the persons who passed behind her, each one repeating the expression as to the road to Sandy Hill and asking for a drink of water, and she was asked to detect, if she could by the voice, the person who used the same language on the night after the murder at her house. Mrs. Wing recognized the prisoner by his voice under such circumstances. In neither instance did he deny that he was the person she saw that night. These experiments so made were admitted in evidence upon the trial upon the theory that his silence might be the basis in the minds of the jury for inferring the truth of Mrs. Wing's assertions; that it was his duty to deny them if not true, and if he did not his silence might be construed against him. It may be inferred, as is said by the judge in his charge, that the proceedings before the coroner's jury during these experiments were informal, still the prisoner was under arrest as the murderer and the inquest was being taken to ascertain the cause of the death, by whom committed, and the experiments were made before the

coroner and the jurors to ascertain what value could be placed upon the evidence of Mrs. Wing.

The court submitted to the jury to find, first, whether the prisoner understood that he was at liberty to speak if he chose; and, secondly, if he did so understand whether he ought to have denied Mrs. Wing's statement at the peril of having his silence construed into an admission of guilt. As has been already indicated the first proposition submitted to the jury was erroneous. That was a question to be decided by the court. But such submission did not harm the prisoner and is not, therefore, the subject of an exception. The evidence was in fact admitted. Was it competent? The answer depends chiefly upon the character of the experiments made. If they were made to affect the judgment and confirm the belief of the jurors in the evidence of Mrs. Wing; if they were given to corroborate and sustain the accuracy of her memory, the coroner and jurors being present and witnessing it to satisfy themselves thereby of her accuracy, then it would seem to be legitimately a part of a judicial proceeding or investigation. Such evidence was not admissible to sustain Mrs. Wing or corroborate her evidence. It could serve no purpose except as evidence of an implied admission inferable from his neglect to deny Mrs. Wing's statements made upon such experiments. Was her statement one of an absolute fact, or of her belief founded upon the prisoner's appearance and voice. If the latter he was not called upon to deny, because it was doubtless true she believed what she said. But if we assume that it was the assertion of the fact that he was at her house, as stated, was the evidence admissible? It is conceded that it was not competent if a part of a judicial proceeding. The court upon the trial so indicated. Was the prisoner called upon to deny? Did he suppose he was at liberty to deny? What would his denial be beyond a denial of the accuracy of the result of the tests then made?

The evidence shows the progress of a judicial investigation before the coroner, at which the prisoner was present under arrest. The experiments were tried as aids to the discovery of the truth and to assist the jurors in reaching a correct conclusion. The minutes of the evidence, taken at that time, contain also some of these details. Evidently it was treated by those present and was, in fact, a part of the proceedings, although somewhat informal by reason of

the things being done. Doubtless the evidence so acquired was weighed and used by the jurors. So the prisoner might well and properly have thought that an interruption by him would be out of place and improper. In such case his silence was involuntary and furnished no evidence of acquiescence in the statements of Mrs. Wing. (1 Green. Ev., § 197 and note, 215; Whar. Cr. Law, § 696; Roscoe Cr. Ev., 52.)

The conduct, demeanor and casual and free ·declarations of persons accused of crime are, however, competent and often cogent evidence against them. Such was the declaration of Houseman, the accomplice of Eugene Aram, affirming with confidence that certain bones accidentally discovered were not those of Daniel Clark, whereby he was suspected of having had something to do with the disappearance of Clark, and was afterwards brought to confess his crime. (Wills Circ. Ev., 68.) So in the case of Dr. Webster, who asked if they found the whole of Dr. Parkman's body, thereby indicating his knowledge that it had been cut in fragments. (Bemis Rep., 178.) The demeanor and appearance of the accused when being charged with the crime or upon trial, may often afford satisfactory evidence. (Rosc. Cr. Ev., 52; Burrill Circ. Ev., 502.) Still such evidence is generally of slight value and of little effect, and should be used by courts and juries with great caution.

But, ·it seems to us, a more serious error was committed when the letters of third persons, found in the possession of the prisoner, were admitted in evidence against him without proof that they were answers to letters of the prisoner or of his letters in answer to the same. Such letters are the declarations of third parties and, as hearsay, are not evidence of any facts. (Whar. Cr. Ev., §§ 644, 682; 1 Gr. Ev., § 124; *Rex* v. *Plumer*, Rus. & Ry. C. C., 264.) · Indeed, the court held these letters were not evidence of any facts, nor were they claimed to be part of the *res gestœ*. But they were received as evidence of information, which came to the prisoner and some evidence of how he understood things were. In other words, the letters were allowed to show the prisoner in possession of certain alleged facts which might constitute a motive for his crime. These letters were all written some little time before the murder. Some of them were from Jennie Pair, a daughter of the deceased, one from Mrs. Terrialt, a sister of the deceased, with whom Jennie

staid a part of the time, and one from the deceased himself. In no case is there any evidence of letters from the prisoner to the various persons, to which these letters were answers, nor that he answered them. Some of the letters of Jennie indicate the existence of a correspondence between her and George, but his letters are not produced, and the only knowledge of their contents are derived from Jennie's letters. The letter of the deceased, as well as some other evidence, leads us to infer that this letter was in answer to one from George to him, but the latter is not produced. There is no evidence of correspondence between George and Mrs. Terrialt. The letter of the deceased to George was written more than two months before the murder. It cannot be said, then, to be information upon which George acted. It may have been notice of the state of mind of John B. Pair, but it is not evidence of that fact. So far as notice was necessary of such fact, it was abundant before George left for the west. There could be no doubt of the existing hostility between them. So it was proving, by the written declarations of a third person, notice and motive which was capable of direct evidence.

The letter of Mrs. Terrialt is still less capable of being treated as evidence against the prisoner. It is possible that one of Jennie's letters, in connection with the intercepted letter of George, may be evidence of the improper relations existing between them. But George's letter is dated May 12, 1880, while Jennie's, containing the same symbols, was dated October 11, 1880. Besides there is no evidence she ever saw his letter or knew its contents. She was a competent witness and could have been put upon the stand to prove their impure relations. Perhaps she would have denied it. But that would scarcely be a reason why it might be proved by her written declarations. Hence, we conclude the letters of John B. Pair, Mrs. Terrialt and Jennie Pair were not competent evidence against the prisoner under the facts established. They are mere hearsay. (2 Whart. Law of Ev., §§ 1127, 1103, 1154; *Smiths* v. *Shoemaker*, 17 Wall., 630; *Com.* v. *Eastman*, 1 Cush., 189; *Rex* v. *Horne Tooke*, 25 How. St. Tr., 120.)

These remarks do not, however, apply to the letter of the prisoner addressed to Jennie Pair and intercepted. That is evidence, in the same manner as any other declaration, against him.

It is also believed that the learned judge erred in his instructions to the jury touching the inferences that might be drawn from the evidence furnished by these letters and the right or duty of the prisoner in respect thereto. In effect he left it for the jury to say whether certain inferences might be properly drawn from Jennie's letter, and tells them the prisoner had a knowledge of his own letter, to which Jennie's was an answer, and that, if he desired, he could give an explanation; "that he had the right to produce that letter if in existence, or if not in existence he would have the right, if *in his power*, to show what the letter contained. And in considering the letter from Jennie to him you have the right to take into consideration his knowledge of what the letter contained, and his ability to produce it or give its contents."

This came very near saying that the jury might take into account the neglect of the prisoner to put himself on the stand to explain facts pressing upon him, and thereby creating a presumption against him. That would be in direct violation of the statute (chap. 678, Laws of 1869). (*Ruloff* v. *People*, 45 N. Y., 221, 222; *Com.* v. *Harlow*, 110 Mass., 411; *Com.* v. *Maloney*, 113 id., 213.)

We have reviewed such important questions as will necessarily arise on any future trial. Since, for the errors indicated, a new trial must be had, it is not deemed essential to examine the very many exceptions presented by the prisoner's counsel. Doubtless many of the points excepted to will not again be presented in objectionable form.

The conviction and judgment should be reversed and a new trial granted.

LEARNED, P. J.:

Concurring in the result of my Brother BOARDMAN's opinion, I am not willing to say that the letters found in the prisoner's possession were not admissible solely for the purpose of showing notice to him of the statements therein contained; not as evidence of the truth of those statements. But as bearing on the question of motive it seems to me to have been proper to prove what statements had come to the prisoner's knowledge which might excite his ill-will towards the deceased.

By the charge, however, the letters were made evidence of the

truth of the statements therein contained or of matters thereby implied. Thus the letters found in his trunk are said to be proper evidence of the illicit intercourse. I do not think that is correct. A letter written to a man charging him with wrong-doing is not evidence against him of the wrong-doing, even if he preserves the letter. But it might show that the person who wrote it had thus done an act tending to irritate the person to whom it was written.

I should also be inclined to think that the submission of the letters to the jury by consent was a waiver of the objection that they were not properly admitted, though, of course, not a waiver of the improper effect given to them by the charge.

Present — LEARNED, P. J., BOCKES and BOARDMAN, JJ.

Judgment and conviction reversed, new trial granted.

Order to be settled by BOARDMAN, J.